**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| STANLEY KOGUT, deceased, by and Through Amanda Kogut, as Independent Administrator of the Estate of Stanley Kogut, and AMANDA KOGUT, individually, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. 16-cv-10199 |
| v. | ) ) | Hon. Steven C. Seeger |
| UNITED STATES OF AMERICA, | ) ) | |
| Defendant. | ) ) ) | |

**MEMORANDUM OPINION AND ORDER**

Stanley Kogut, a former deputy with the Cook County Sheriff's Office, was arrested on November 3, 2014 on federal charges. He was detained pretrial at the Chicago Metropolitan Correctional Center ("MCC"). Less than 10 hours later, he committed suicide.

His estate and widow sued the United States for negligence, wrongful death, and survival under the Federal Tort Claims Act ("FTCA"). The United States now moves for summary judgment on all claims.

For the reasons stated below, the motion for summary judgment is granted in part and denied in part.

**Background**

**I.     Kogut's Arrival and Screening at the MCC**

On November 3, 2014, the FBI arrested Stanley Kogut and another police officer, Robert Vaughan. They were charged with conspiracy to commit robbery. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 2 (Dckt. No. 86).

The FBI transported Kogut to the MCC, a federal detention facility operated by the Bureau of Prisons in downtown Chicago. Correctional officers received him at approximately 5:30 p.m. *Id.* at ¶ 3. Twenty minutes later, Correctional Counselor Michael Wright conducted an intake screening. *Id.* at ¶ 5.

Wright asked questions about issues that could affect Kogut's placement or treatment while at the MCC (like relationships with other inmates or gang affiliations). *Id.* He asked about his mental health – particularly any thoughts of self-harm. *Id.*

Kogut also had the opportunity to ask questions and voice any concerns. *Id.* at ¶ 6. He stated that he was a member of law enforcement, so he did not believe that he should be in general population. *Id.* at ¶ 7.

The parties disagree over the interpretation of Kogut's statement that he was in law enforcement and that he did not believe he should be housed in general population. The government considers it a *reason* for segregation, but the estate considers it a *request* for segregation. *See* Def.'s Resp. to Pl.'s Statement of Facts, at ¶¶ 2, 5 (Dckt. No. 91). That is, the government understands his statement to mean, "I am a police officer, so I have a reason to be isolated." But the estate interprets Kogut's statement to mean, "I am a police officer, so I want to be isolated."

The distinction matters when the BOP decides where a new detainee should go. If a new detainee specifically asks for protective custody, or requests to be celled alone, the MCC's internal rules advise that he "be referred to [a] supervisor and psychology services immediately." *See* Special Post Orders, at 9 (Dckt. No. 75-6). So, if the estate's interpretation is correct, the MCC should have sent Kogut to see a psychologist. But if the United States is correct, then the MCC had no obligation to send him to a supervisor and a member of the psychology team.

There is no other evidence in the record of any request by Kogut to be isolated or to see a doctor. Both parties agree that Kogut did not see a psychologist or psychiatrist that night.[1] *See* Def.'s Resp. to Pl.'s Statement of Facts, at ¶ 2 (Dckt. No. 91).

Wright then gave Kogut intake screening paperwork. Kogut completed a one-page psychology services questionnaire about his mental health, including his history and his then-current condition. *See* Inmate Questionnaire (Dckt. No. 75-7). The form asked whether he had any thoughts of self-harm. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 9 (Dckt. No. 86). After Kogut completed the form, Wright reviewed his answers with him orally, to make sure that the written answers matched the oral responses. *Id.* at ¶ 10.

A few answers stand out. First, on the form and in the interview, Kogut stated that he was "tense, nervous, anxious." *See* Def.'s Resp. to Pl.'s Statement of Facts, at ¶ 5 (Dckt. No. 91); *see also* Inmate Questionnaire, at 1 (Dckt. No. 75-7).

Second, he answered that he was experiencing alcohol withdrawal. *See* Def.'s Resp. to Pl.'s Statement of Facts, at ¶ 5 (Dckt. No. 91); *see also* Inmate Questionnaire, at 1 (Dckt. No. 75-7). But he did not answer the question about whether he wanted to participate in drug abuse treatment. *See* Inmate Questionnaire, at 1.

Third, Kogut answered questions about self-harm. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 11 (Dckt. No. 86). The form asked: "Have you ever seriously considered harming or killing yourself?" *See* Inmate Questionnaire, at 1 (Dckt. No. 75-7). Kogut checked a box,

---

[1] The MCC did not put the other officer who was arrested (Vaughan) on suicide watch, either. At least not initially. But after Kogut committed suicide, the MCC placed Vaughan on 24-hour suicide watch. *See* Vaughan Dep., at 39:1-3 (Dckt. No. 75-11). The MCC placed precautionary instructions on the door of his cell. He received a tear-resistant mattress, and did not receive sheets or undergarments. *See* Def.'s Resp. to Pl.'s Statement of Facts, at ¶ 9 (Dckt. No. 91).

answering "NO." *Id.* The form also asked if he had "ever attempted to harm or kill yourself," and Kogut responded "NO." *Id.*

The form asked about his then-present state of mind, too. "Are you thinking of harming or killing yourself now?" *Id.* The form emphasized the importance of that question, in all caps. "IF YES, IT IS IMPORTANT TO LET US KNOW SO WE CAN PROVIDE YOU WITH COUNSELING AND SUPPORT." *Id.* Once again, Kogut answered "NO." *Id.*

Fourth, when completing the form, Kogut did not answer the question about whether he wanted to see a mental health provider while at the facility. *See* Def.'s Resp. to Pl.'s Statement of Facts, at ¶ 6 (Dckt. No. 91); *see also* Inmate Questionnaire, at 1 (Dckt. No. 75-7) (question 14).

Fifth, Kogut did not answer other "Yes" or "No" questions on the form about his mental state. The form asked whether Kogut was currently "sad, tearful, depressed," or "feeling hopeless about life," or "hearing voices or seeing things others do not." *See* Inmate Questionnaire, at 1 (Dckt. No. 75-7). He left each of those questions unanswered. *Id.*

His failure to answer those questions was conspicuous. He did answer question 13.B, meaning whether he was "tense, nervous, anxious." *Id.* He circled "YES." *Id.* But he did not answer question 13.A ("sad, tearful, depressed"), question 13.C ("feeling hopeless about life"), or question 13.D ("hearing voices or seeing things others do not"). *Id.*

The record includes a declaration from Wright about how he perceived Kogut at the time. Kogut "appeared stable," and Wright "did not find anything in his demeanor or emotional state that made [him] believe that he might harm himself." *See* Wright Dec., at ¶ 11 (Dckt. No. 75-3).

When answering Wright's oral questions, Kogut confirmed that he had never attempted to kill or harm himself, and had never considered doing so. *See* Pl.'s Resp. to Def.'s Statement

of Facts, at ¶ 11 (Dckt. No. 86); Wright Dec., at ¶ 10 (Dckt. No. 75-3).  Kogut "specifically said that he was not having any current thoughts of harming himself."  *See* Wright Dec., at ¶ 10.

On that critical topic, the estate does not deny what Kogut said to Wright.  But the estate believes that there is a question of fact about "whether Stanley Kogut was properly assessed given his risk factors for suicide and MCC suicide prevention protocols."  *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 11 (Dckt. No. 86).

After meeting with Wright, Kogut met with Lida Carrera, a mid-level practitioner on the MCC medical staff.  *Id.* at ¶ 13.  She conducted a medical intake screening.  The goal was to learn and assess Kogut's past and current medical issues so that the medical staff could provide continuity of care.  *Id.*

This screening included assessing his emotional state, mental health, and any risks of self-harm.  *Id.*  Carrera had received annual training on preventing suicide and identifying risks of self-harm.  *Id.* at ¶ 14.

During the 30-minute, private meeting, Carrera performed a basic physical examination and obtained an oral history of his past and current medical problems.  *Id.* at ¶ 15.  She assessed suicide risk by asking direct questions and closely observing Kogut's emotional state, behavior, level of cooperation, and overall attitude.  *Id.*

The record includes a declaration from Carrera about how Kogut seemed at the time. Kogut's "mood was normal and appropriate, and he did not express any unusual or concerning thoughts."  *See* Carrera Dec., at ¶ 7 (Dckt. No. 75-4).  Kogut denied any history of suicide attempts and denied any current suicide ideation.  *Id.*

According to Carrera, nothing in Kogut's demeanor or posture indicated that he was "deceptive in his denials of suicide ideation."  *Id.* at ¶ 8.  In her view, Kogut "maintained himself

5

in a stable, cooperative, and attentive manner." *Id.* Overall, his behavior gave her "no cause for concern" about a "risk of self-harm." *Id.*

Once again, the estate takes issue with those characterizations. The estate believes that depicting Kogut as normal and stable was inconsistent with his responses that he was experiencing alcohol withdrawal, and feeling "tense, nervous and anxious." *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 18 (Dckt. No. 86).

## II.     Security in the Special Housing Unit at the MCC

Carrera's screening ended around 6:47 p.m. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 16 (Dckt. No. 86). That's when Kogut went to the Special Housing Unit, also called the "SHU" (like "shoe").

As the name suggests, the Special Housing Unit is a place where certain inmates go to get away from other inmates. Inmates go to the SHU for a variety of reasons, including disciplinary reasons, special security needs, and so on. Sometimes an inmate needs special protection from other inmates (or vice versa). *See* Maldonado Dep., at 20:13-24 (Dckt. No. 85-2).

Inmates with a law enforcement background often fall in that category. In that situation, the MCC initially places those inmates in the SHU for safety and security reasons. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶¶ 8, 20 (Dckt. No. 86). It is a way of offering those inmates added protection.

The MCC followed that practice when it came to Kogut. The operations lieutenant assigned Kogut to the SHU, located on the 11th floor. *Id.* at ¶ 19. Raul Maldonado – the former chief of correctional services and person responsible for the MCC's security – confirmed that housing Kogut in the SHU was appropriate and consistent with the MCC's normal practice. *See* Maldonado Dec., at ¶¶ 1–2, 12–13 (Dckt. No. 75-1).

6

The record includes a copy of a map showing the layout of the floor of the SHU.  *See* Map (Dckt. No. 91-1).  The floorplan is important to the case for a few reasons.  One of the issues is whether the guard responded to cries for help from other inmates.  Another issue is whether the BOP responded quickly enough once the guard discovered Kogut.

The layout of the SHU is important to both issues.  It shows the distance between Kogut's cell and the guard's office.  It depicts the internal barriers, such as the number of doors between Kogut's cell, the office, and the elevator.  And it sheds light on the acoustics, too.

Each floor of the MCC is shaped like a right triangle.  The exterior of the floor contains the cells.  *Id.*  The interior of the floor is the space for hallways, recreation rooms, the office for the guards, and so on.  *Id.*

The SHU contains two separate areas with cells, called ranges (or modules).  *See* Maldonado Dep., at 23:1-3, 27:20 – 29:2 (Dckt. No. 85-2); Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 25 (Dckt. No. 86).  The officer's station is in the middle of the floor.  The sallyport is the area with the elevator to the rest of the building, and it is in the part of the triangle with the right angle.  *See* Map (Dckt. No. 91-1).

The map shows the cell where Kogut resided that night.  *Id.*  It also shows each of the two modules, as well as the location of the officer's station.  *Id.*

Traveling between Kogut's cell and the officer's station would require a person to pass through a number of doors (based on the Court's review of the map, that is).  The number of doors depends on which direction a person walks when going from Kogut's cell to the office for the guards.  If traveling clockwise, a person would go through:  (1) the cell door; (2) the door between the two modules (by the showers); (3) the door between module 1115 and the place with the officer's station and the reception area; and (4) the door to the officer's station.  *Id.*  If

traveling counter-clockwise, a person would have to walk through three doors: (1) the cell door; (2) the door between module 1130 and the reception area; and (3) the door to the officer's station. *Id.*

The SHU includes a number of different *types* of doors. Three of those doors are relevant here: the cell door, the range door, and the sallyport door. Each of those three doors uses a different key. (There are "security doors," too. *See* Maldonado Dep., at 28:6-16 (Dckt. No. 85-2). Some of the doors described above were security doors. But the keys to *those* doors aren't relevant here.)

Every detainee in the SHU is secured behind a locked cell door. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 36 (Dckt. No. 86). As an additional layer of security, the cells are separated from the remainder of the SHU by multiple locked doors. One door separates the two SHU ranges from the SHU visitor lobby and officer's office. Another door separates the SHU from the inter-floor elevator. *Id.*

Each of the doors has a corresponding key. To open any locked cell, there is one key – the cell key. The range key opens the door to the cell ranges. And the sallyport key opens the door to the elevator. *Id.*

The SHU follows a rigorous security protocol around these keys and doors. First, the cell door key is never present in the range unless two staff members are present. *Id.* at ¶ 39. Second, the range key and sallyport key cannot be on the range if the cell door key is on the range. *Id.* at ¶ 40. All three keys can't be together.

The location of the keys depends on the time of day. During the day, three officers work in the SHU. Only two officers are present on the range at a time. The third officer maintains the range key and sallyport key outside the range. *Id.* at ¶ 41.

8

During the overnight shift, only one officer works in the SHU. *Id.* at ¶ 42. One officer cannot have all three keys at once. But the overnight officer also needs to get in and out of the range, which means that the overnight officer needs to hold the range key and the sallyport key. *Id.* So the cell key needs to be elsewhere.

During the overnight shift, the cell key is locked in the control center, an area that is always staffed. *Id.* The control center is not on the eleventh floor (where the SHU is). *Id.* The control center is on the second floor. *Id.* That's nine floors away.

That placement has implications if something goes wrong during the night shift. If something happens in a cell in the SHU, the guard cannot enter right away because the guard does not carry the cell key. Instead, the guard needs to radio for someone to bring him the cell key. That other officer, in turn, must grab the key, go up nine floors, use the sallyport key, enter the SHU, use the range key, enter the range, and *then* use the cell key to gain access to the cell. That takes time.

The reason for putting the key on another floor is, simply, security: "The primary concern of the officers working the Special Housing Unit is security." *See* Special Post Orders, at 1 (Dckt. No. 75-6). Using multiple keys – and separating them, by floor – enhances security. If a detainee somehow takes one key, this setup prevents the inmate from getting very far. *See* Maldonado Dec., at ¶ 10 (Dckt. No. 75-1). Multiple locked doors with multiple keys – on different floors – prevent an inmate from escaping.

The MCC's nighttime staffing of the SHU is not unique. *Id.* at ¶ 11; Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 44 (Dckt. No. 86). Inmates leave their cells during the day for medical visits, legal consultations, exercise, and so on. But inmates don't leave their cells as often during the night. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 44. Less movement means that there

is a lesser need to monitor movement. So the Bureau of Prisons made a decision, for all correctional facilities nationwide, that it could save costs by reducing the amount of staff at SHUs during the nighttime shifts. *Id.*

## III. The Discovery

Turning back to the story, the SHU officer on the night in question was Vincent Cannon. *Id.* at ¶ 24. Again, only one officer is assigned to the SHU during overnight hours.

Starting a little after 10:00 p.m., Cannon made eight rounds in irregular intervals (but usually every 30 to 40 minutes) to the two SHU ranges, checking on the status of each of the detainees. *Id.* at ¶ 25; *see also* Special Housing Unit 30 Minute Check Documentation (Dckt. No. 75-9). The lights were off, so he shined a light into each cell to see the occupants. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 25 (Dckt. No. 86).

One purpose of the rounds was for Cannon to listen to concerns or requests, but because it was nighttime, he would not initiate conversation. *Id.* at ¶ 26. Instead, he depended on the detainees to request assistance after they heard the door and his keys clank during his approach. *Id.*

Cannon saw Kogut three times during his rounds that night. During his first round, Kogut was pacing in his cell. *See* Cannon Dec., at ¶ 7 (Dckt. No. 75-2); Special Housing Unit 30 Minute Check Documentation (Dckt. No. 75-9). Cannon does not state a time, but the time sheet says 10:09 p.m., and the parties do not appear to dispute it.

During his last round before Kogut's death (at 1:46 a.m.), Cannon saw Kogut lying on his bed, looking asleep. *See* Cannon Dec., at ¶ 7 (Dckt. No. 75-2).

Cannon's third round took place around 2:15 a.m., about half an hour later. *Id.* at ¶ 8. That's when Cannon made the discovery.

10

There is a factual dispute about the noise in the SHU ranges during those later rounds. Two SHU inmates – Robert Vaughan (the other officer who was arrested) and Frank Farella – testified that there was loud shouting for about 10-20 minutes before Cannon's final round. *See* Vaughan Dep., at 71:11 – 74:22 (Dckt. No. 75-10); Farella Dep., at 20:9 – 23:16 (Dckt. No. 75-11); *see also* Pl.'s Statement of Facts, at ¶¶ 15–16, 21–24 (Dckt. No. 85) (describing "hollering," "loud banging," and "screaming"). They were down the hall. Vaughn was four cells away (plus the area for the showers), and Farella was in the cell next to Kogut.

But according to Cannon, he didn't hear it. Cannon heard nothing while patrolling the SHU range during his rounds at 1:46 a.m. and 2:15 a.m. *See* Cannon Dec., at ¶¶ 7–8 (Dckt. No. 75-2). He also claims that he didn't hear anything while he was in the SHU office between the rounds. *Id.* at ¶ 7.

Cannon reached Kogut's cell at around 2:17 a.m. That's when he saw Kogut hanging from the top of the bunk bed. A bed sheet was tied around his neck, and his face was purple. *Id.* at ¶ 9; *see also* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 31 (Dckt. No. 86). Cannon immediately activated his body alarm and radioed for assistance. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶¶ 31, 34.

A camera captured video of Cannon's final round. The video shows Cannon walking down the hallway and arriving at Kogut's cell around 2:17 a.m. *Id.*; *see also* Video, at 0:32 (Dckt. No. 76-5). He sounded his alarm, called for help, and turned on the lights. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 34 (Dckt. No. 86); Video at 0:40 – 1:16.

But he couldn't enter the cell, because he did not have the cell key. It was nine floors away, in the control center on the second floor.

11

Shortly after 2:20 a.m., two more officers (Swan and Sands) arrived. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 34 (Dckt. No. 86); Video, at 3:33-38 (Dckt. No. 76-5). The officers left the scene (and the view of the camera) and returned several times in the next few minutes. A fourth officer delivered the key at 2:21 a.m., and an officer opened Kogut's door at 2:22 a.m. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 34; Video, at 4:55 – 5:30. The final two minutes of the video show two officers coming and going from the cell a couple times before returning with what looks like medical equipment. *See* Video, at 5:30 – 7:14. The video ends at 2:24 a.m.

The correctional officers performed CPR, but to no avail. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 35 (Dckt. No. 86). Paramedics arrived at 2:40 a.m. *Id.* Sadly, there was nothing that they could do.

One of the main issues in this lawsuit is the amount of time that lapsed between Cannon (1) noticing Kogut hanging from a bedsheet, and (2) opening the door. There is no dispute that it took several minutes.

The estate repeatedly argues that there is a question of fact "as to (1) whether the practice of keeping the 11th floor SHU cell key on the 2nd floor violated the Bureau of Prisons and MCC specific 'four-minute response' requirement for medical emergencies; (2) whether Maldonado realized the Bureau of Prisons and the MCC had specific written policies that required a 'four-minute response' for medical emergencies; and (3) whether SHU staff received any training on Bureau of Prisons and MCC specific 'four-minute response' requirement for medical emergencies." *Id.* at ¶¶ 39–44.

The United States agrees that the BOP has a policy that requires a four-minute response time to life-threatening medical emergencies. *See* Def.'s Resp. to Pl.'s Statement of Facts, at

¶ 28 (Dckt. No. 91).  The government also agrees that the MCC sought to accomplish this response time and required their correctional officers to receive training for this response time. *Id.* at ¶¶ 32–33; *see also* Inmate Questionnaire, at 1 (Dckt. No. 75-7).  But the exact meaning of the four-minute response time is up in the air (on this record, anyway).

## IV.    The Lawsuit

In June 2016, Kogut's widow, Amanda Kogut, timely filed an administrative claim with the BOP.  *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 45 (Dckt. No. 86).  The BOP denied her claim in December 2016.  *Id.*

On October 31, 2016, the estate and Amanda Kogut (collectively, "the estate") filed this lawsuit.  *See* Cplt. (Dckt. No. 1).  They later amended the complaint.  *See* Am. Cplt. (Dckt. No. 21).  The amended complaint included a *Bivens* claim and a section 1983 claim against two employees of the MCC (*i.e.*, Defendants Bauknecht and Wright).  *Id.* at Counts I & II.  But the parties later agreed to dismiss the claims against the individual defendants.  *See* Mtn. (Dckt. No. 46); 11/18/19 Order (Dckt. No. 48).

The amended complaint also included three counts against the United States.  *See* Am. Cplt., at Counts III, IV, & V (Dckt. No. 21).  Count III is a claim under the Federal Tort Claims Act.  *Id.* at Count III.  Count IV is a wrongful death claim under Illinois law.  *Id.* at ¶ 42 ("[T]his cause of action is brought pursuant to the Wrongful Death Act, 740 ILCS 180/0.01 et seq.").  Count V is a claim for survival "pursuant to the Illinois Survival Statute, 735 ILCS 5/27-6."  *Id.* at ¶ 46.

This Court will treat all three remaining counts as claims under the Federal Tort Claims Act.  Under the Act, "the district courts . . . shall have exclusive jurisdiction of civil actions on claims [1] against the United States, [2] for money damages . . . [3] for injury or loss of property,

13

or personal injury or death [4] caused by the negligent or wrongful act or omission of any employee of the Government [5] while acting within the scope of his office or employment, [6] under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." *See* 28 U.S.C. § 1346(b).

An FTCA claim is a *federal* claim that looks to state law for the substance of the cause of action. The Act did not authorize plaintiffs to bring state law claims *qua* state law claims against the United States. *See Brownback v. King*, 141 S. Ct. 740, 749 (2021) ("Plaintiffs were (and are) required to bring claims under the FTCA in federal district court. Federal courts have jurisdiction over these claims if they are 'actionable under § 1346(b).' A claim is actionable if it alleges the six elements of § 1346(b) . . . .") (citation omitted). Violating state law is only one of "six elements" of a claim under the FTCA. *Id.*; *see also* 28 U.S.C. § 1346(b) (authorizing district courts to hear claims "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred").

After discovery, the United States moved for summary judgment on all remaining claims. *See* Def.'s Mtn. for Summ. J. (Dckt. No. 72); Mem. in Support of Def.'s Mtn. for Summ. J. ("U.S. Mem.") (Dckt. No. 74).

### Legal Standard

Rule 56 provides that the Court "shall grant" summary judgment when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine dispute about a material fact exists if the "evidence is such that

a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The substantive law controls which facts are material. *Id.* After a "properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Id.* at 250 (citations omitted).

The Court "consider[s] all of the evidence in the record in the light most favorable to the non-moving party, and [] draw[s] all reasonable inferences from that evidence in favor of the party opposing summary judgment." *Skiba v. Illinois Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018) (quotation marks omitted). The Court gives the non-moving party "the benefit of reasonable inferences from the evidence, but not speculative inferences in his favor." *White v. City of Chicago*, 829 F.3d 837, 841 (7th Cir. 2016) (citations omitted).

### Analysis

The United States enjoys sovereign immunity, but Congress has waived that immunity in certain discrete circumstances. *See F.D.I.C. v. Meyer*, 510 U.S. 471, 475 (1994) ("Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit."). The United States has immunity, except where it says that it doesn't.

"In the FTCA, Congress waived the United States' sovereign immunity for claims arising out of torts committed by federal employees." *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 217–18 (2008). "The remedy provided by the FTCA is the 'exclusive' basis for a common law tort claim against an officer or employee of the federal government 'while acting within the scope of his office or employment.'" *See Beaulieu v. Ashford Univ.*, 529 F. Supp. 3d 834, 848 (N.D. Ill. 2021) (Dow, J.) (citations omitted).

The FTCA authorizes claims against the United States in a few discrete areas. One example is a claim about a "death caused by the negligent or wrongful act or omission of any

employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b).

The estate is advancing three FTCA claims, sounding in negligence, wrongful death, and survival under state law. The estate put forward three theories of liability. First, the correctional staff failed to recognize that Kogut was high risk and failed to take precautions to prevent his death. Second, the correctional officer on duty failed to reasonably respond to the shouting detainees. Third, the MCC's practice of keeping the cell key so far from the cell led to a foreseeable and unwarranted delay in accessing Kogut's cell. *See* Pl.'s Mem. in Resp. to Def.'s Mtn. for Summ. J. ("Kogut Mem."), at 2 (Dckt. No. 87).

The United States moves for summary judgment on three grounds. First, the government argues that the estate has failed to prove factual and legal causation. *See* U.S. Mem., at 8–10 (Dckt. No. 74). Second, it argues that the discretionary function exception to the FTCA protects its decision about where to keep the keys. *Id.* at 11–14. Third, it argues that Kogut was the primary cause of his own death, so any recovery is barred under Illinois law about contributory fault. *Id.* at 14–15.

The Court will start with the theory about where to place the cell key. The Court then will turn to the BOP's response to the Kogut interview, and the lack of a response to the cries for help from other inmates.

The Court concludes that the discretionary function exception applies to the BOP's decision about where to keep the cell key, and thus there is no liability under the FTCA. The Court also concludes that the estate has not offered sufficient evidence to support a claim that the

BOP should have recognized Kogut's suicide risk. But the estate has come forward with enough evidence on the claim about responding to cries for help from other inmates.

## I.     Discretionary Function Exception

The FTCA waived sovereign immunity for certain types of claims, including a claim about a death caused by a federal employee. But even then, there are a number of important exceptions. One of those carve-outs is relevant here: the discretionary function exception.

Congress carved an exception in the text of the statute for discretionary functions. The ability to bring a claim against the United States "shall not apply to . . . [a]ny claim based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a).

The exception "marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals." *See United States v Varig Airlines*, 467 U.S. 797, 808 (1984). "The purpose of this discretionary-function exception is to 'prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort.'" *Reynolds v. United States*, 549 F.3d 1108, 1112 (7th Cir. 2008) (quotation marks omitted) (quoting *Varig Airlines*, 467 U.S. at 814).

"The exception is an affirmative defense, and to prevail on it, the government must establish two elements 'beyond reasonable dispute.'" *McCoy v. United States*, 731 F. App'x 524, 526 (7th Cir. 2018) (quoting *Keller v. United States*, 771 F.3d 1021, 1023 (7th Cir. 2014)). If both elements apply, then the United States has no liability, even if its actions were negligent. *See Gaubert v. United States*, 499 U.S. 315, 323 (1991).

17

First, the act must be "discretionary rather than mandatory, involving judgment or choice." *Id.* "The requirement of judgment or choice is not satisfied if a 'federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow,' because 'the employee has no rightful option but to adhere to the directive.'" *Gaubert*, 499 U.S. at 325 (quoting *Berkovitz by Berkovitz v. United States*, 486 U.S. 531, 536 (1988)); *see also Corpeno-Argueta v. United States*, 341 F. Supp. 3d 856, 865 (N.D. Ill. 2018) ("Government conduct is not discretionary if it is subject to a mandatory federal statute, regulation, or policy that requires a specific course of action."). The exception does not apply if the government employee is boxed in, leaving no room for a judgment call.

Second, the act must be "based on considerations of public policy." *Reynolds*, 549 F.3d at 1112. That is, even if the act involves the exercise of judgment, the question is "whether that judgment is of the kind that the discretionary function exception was designed to shield." *Berkovitz*, 486 U.S. at 536. Courts look to the "nature of the actions taken," and consider "whether they are susceptible to policy analysis." *Gaubert*, 499 U.S. at 325.

The decision where to keep the cell key falls squarely within the discretionary function exception. That decision is discretionary, not mandatory. The parties have not pointed to any statute, regulation, or policy that governs where a facility must keep the cell key. *See* U.S. Mem., at 13 (Dckt. No. 74); Kogut Mem., at 9 (Dckt. No. 87). There is no mandatory policy, for example, that the guard on duty must carry the key, or that the key must reside on the same floor as the inmates. There's nothing on the books, so there is room to make a judgment call about where to keep it.

Selecting where, exactly, to keep the cell key is the sort of decision that involves the exercise of judgment. The BOP sometimes needs access to cells, but always needs to ensure that

18

inmates do not leave the building. Security decisions in a prison require the exercise of judgment, and the careful balancing of policy considerations. Deciding where to keep the keys is part of the decision-making about how best to secure the inmates.

Here, the MCC adopted well-defined protocols about where the cell key needs to be at any given time. Those protocols reflect the BOP's efforts to balance the need for access with the overriding need to maintain security. The decision where to place the cell key "requires judgment as to which of a range of permissible choices is the wisest." *Gaubert*, 499 U.S. at 325.

The setup reflects multiple layers of thinking about security. It takes three keys to leave the SHU. All cell doors in the SHU use the same key – the "cell key." *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 36 (Dckt. No. 86); *see also* Maldonado Dec., at ¶¶ 4–10 (Dckt. No. 75-1). As additional layers of security, there are two other locked doors, each with different keys. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 36. One locked door separates the cells from the SHU visitor lobby and the officer's office, and requires the "range key." *Id.* And another locked door separates the SHU from the inter-floor elevator, and requires the "sallyport key." *Id.*

Again, the cell key cannot be on the floor of the SHU unless two staff members are present. *Id.* at ¶¶ 40–41. And even then, the cell key cannot be on the floor at the same time as the keys that give access to the rest of the MCC. *Id.* All three keys can't be on the floor at once. Otherwise, someone could take them and make a break for the exits.

But during the night shift, the restrictions are even tighter. During overnight hours, only one officer works in the SHU. *Id.* at ¶ 42. That officer needs the range key and the sallyport key to do patrols. *Id.* So the overnight guard does not carry the cell key.

In fact, the cell key is not on the floor of the SHU (the eleventh floor) during overnight hours. *Id.* Instead, during the night shift, the cell key is kept in the control center, which is located on the second floor. *Id.* The upside is that the SHU is more secure – it is harder to get out. The downside is that it is harder to get *in*, too.

Placing the cell key on a different floor is a permissible judgment call about how best to keep security at the prison. The Supreme Court "enforces a point repeatedly" that "prison officials have broad administrative and discretionary authority over the institutions they manage." *Westefer v. Neal*, 682 F.3d 679, 684 (7th Cir. 2012) (cleaned up) (quoting *Hewitt v. Helms*, 459 U.S. 460, 467 (1983)). The decision about how to lock doors – and how to keep them locked – falls squarely within the wide boundaries of that discretion. The FTCA does not permit a factfinder to second-guess whether the BOP is putting the cell key in the right place.

The estate is not arguing that a statute, regulation, or policy dictated where, exactly, the BOP needed to place the keys to the cells of the inmates. Again, there is no express requirement for where a facility must keep the keys, and the estate makes no such argument.

Instead, the estate argues that another BOP policy indirectly limits the permissible placement of the keys, albeit in a roundabout way. The gist of the argument is that the BOP requires a four-minute response time for medical emergencies. So the keys can't be more than four minutes away.

The BOP (in general) and the MCC (in particular) have guidelines about the immediate response to an emergency.[2] The BOP's Program Statement entitled "Patient Care" includes a

---

[2] As an aside, it is not clear to the Court that the policies actually cover *how quickly* a guard must respond, as opposed to *whether* a guard knows *what* to do when he or she encounters an inmate with an emergency. The BOP policy refers to the "ACA standards." *See* BOP Program Statement 6031.01, at 9 (Dckt. No. 85-6); *id.* at 3 (citing a list of ACA standards); MCC Institute Supplement CCC 6031.01C, at 1 (Dckt. No. 85-7) (citing a list of ACA standards). Those standards aren't in the record. But based on the Court's review, the American Correctional Association has standards to ensure that guards know what to

section entitled "EMERGENCY/URGENT CARE."  *See* BOP Program Statement 6031.01, at 9 (Dckt. No. 85-6).  That Policy Statement includes the following sentence:  "ACA standards require a four-minute response to life- or limb-threatening medical emergencies."  *Id.*

The MCC also adopted an Institution Supplement with "procedures for providing necessary medical care to inmates."  *See* MCC Institute Supplement CCC 6031.01C, at 7 (Dckt. No. 85-7).  That Supplement includes a section entitled "Urgent Care," and a subsection entitled "Four-Minute Response."  *Id.*  It reads:  "A four-minute response time is required for all medical emergencies that occur at this institution.  Based on this requirement, correctional and health care personnel will be trained to respond to health related situations within a four minute response time."  *Id.*[3]

As the estate sees it, the BOP must place the keys in a location that would allow guards to respond within four minutes.  The four-minute response time defines the radius and limits the range of possible locations.  If the keys are more than four minutes away, then they're too far away.

---

do when they encounter an emergency.  *See* American Correctional Association, *Standards for Adult Correctional Institutions* (4th ed. 2003); American Correctional Association, *2016 Standards Supplement* (2016).  The ACA standards seem to say that a guard must know what to do within the first four minutes, presumably before help arrives.  *See* American Correctional Association, *2016 Standards Supplement*, at 89, § 4-4389 (2016) ("Designated correctional and all health care staff are trained to respond to health-related situations within a four-minute response time.").  Guards must receive "training" about how to administer "basic first aid," how to give CPR, how to recognize "signs and symptoms," how to deal with a suicidal inmate, and so on.  *Id.*  A guard must know what to do in an emergency.  The ACA standards do not appear to set a stopwatch for how quickly guards must respond.  The question seems to be "does the guard know what to do in the first four minutes?" not "how quickly can the guard get there?"  But the parties did not discuss the ACA standards in their briefs, and the government did not advance that argument, so the Court won't reach it.  In the end, it is neither here nor there.  The BOP had no obligation (as far as the Court can tell) to follow the ACA standards, and maybe the BOP's policy is different than what the ACA standards actually say.  Maybe the BOP adopted a four-minute response, even though the ACA standards (arguably) don't require a response within four minutes.  Again, it reads like training to provide immediate first aid, not training about how to get there faster.

[3]  It goes on to discuss training about CPR and the use of a defibrillator.

21

From a timing perspective, the estate is correct that the guards did not open the cell door within four minutes of noting Kogut's condition. (If "four minutes" means four minutes and zero seconds, that is.[4]) The video captured what happened. Cannon approached Kogut's cell at 2:17:18 a.m. After shining his light into the cell for a few seconds, he placed a call on his radio at 2:17:27 a.m. Another guard brought the cell key at 2:21:41 a.m. Cannon opened the door at 2:22:08 a.m., and the officers entered at 2:22:10 a.m. *See* Video (Dckt. No. 75-5). All told, the response took four minutes and 52 seconds (if a "response" means providing medical care, as opposing to calling for help).[5]

The estate has no claim even though it took almost five minutes to provide emergency medical care. At bottom, the estate is making an argument about why the cell key should be kept closer to the cells. That is, the estate is arguing that the BOP should have made a different policy decision – and should have kept the cell key closer to the SHU – to ensure prompt medical treatment in case of emergency. But that's precisely the sort of policy decision that the FTCA expressly protects.

The need to open doors in case of emergency is a factor to consider when deciding where to keep the keys. But it is not the only factor, and it may not be the most important factor.

---

[4] There is a difference between saying that the guards *didn't* bring the key within four minutes, and that the guards *couldn't* bring the key within four minutes. The record does not reveal why it took almost five minutes to retrieve the key in this particular emergency. Maybe the elevator was busy, or maybe the guard couldn't find it. Or maybe some other reason was at play. That said, for the sake of argument, the Court will assume that the key was far enough away, such that the guards *couldn't* bring it within four minutes.

[5] It is not entirely clear what a "four-minute response" means. Does the clock start ticking when an officer notices the emergency? And if so, what does it mean to respond? Does that mean doing something about it, such as calling someone for help? Or does it mean giving physical aid, person to person? Or something else? For the sake of argument, the Court will assume that the BOP responded when they opened the door of the cell, a little less than five minutes after the guard called for help.

Keeping people who are locked up *locked up* is an important consideration, too. Security in a prison is a paramount concern. Easy access to keys could result in easy escapes.

That's particularly true in the Special Housing Unit, where Kogut was incarcerated. Security is important in prisons, but especially in the SHU. The MCC's Special Post Orders acknowledged the heightened need for security: "The primary concern of the officers working in the Special Housing Unit is security. Inmates are housed in a Special Housing Unit for protection, separation from other inmates, segregation as a result of a disciplinary hearing, investigation, high security risks and any other reasons for which management believes separation from the general population is needed." *See* MCC Special Post Orders, at 1 (Dckt. No. 75-6). When it comes to security, locking the doors is step one.

A guard could open the doors right away during an emergency if he or she carried the keys in his or her pocket while on patrol. But easy access would come at a price. Opening the doors of cells isn't always a positive development. Limiting access to keys is sometimes a good thing (because it prevents escape) and sometimes a bad thing (because it delays access during emergencies).

That's why it's a quintessential judgment call where to keep them. Access to keys is central to security, and security is central to the operation of a prison. Perhaps no judgment call is more central to the operation of a prison than how best to lock the doors (and keep them locked).

In fact, the BOP's own Policy Statement undermines the notion that the four-minute response time creates a rigid boundary for the placement of the keys. The Policy Statement that includes the four-minute response time also recognizes the need to balance security considerations, too. "Health care will be delivered to inmates in accordance with proven

standards of care *without compromising public safety concerns inherent to the agency's overall mission*." *See* BOP Program Statement 6031.01, at 2 (Dckt. No. 85-6) (emphasis added).

True, the estate isn't necessarily arguing that the BOP needed to keep the cell key on the same floor as the SHU. The point is that the BOP needed to keep the key *closer*, not nine floors away. (Again, the SHU is on the eleventh floor, and the control center is on the second floor.) Still, a prison has limited real estate, and the BOP needs to make a whole host of decisions about who and what need to go where. Decisions about security and the best use of limited space are policy decisions, and those decisions receive protection from tort liability.

As a general matter, the Seventh Circuit has recognized that decisions about prisoner safety often fall within the discretionary function exception. *See Palay v. United States*, 349 F.3d 418, 431 (7th Cir. 2003) (noting that precedent "makes clear that prison officials enjoy discretion in matters of inmate safety," without foreclosing the possibility that some decisions might not "involve[] judgment"). Other Circuits have applied the discretionary function exception to questions about prisoner safety, too. *See, e.g.*, *Rinaldi v. United States*, 460 F. App'x 80, 82 (3d Cir. 2012); *Donaldson v. United States*, 281 F. App'x 75, 77–78 (3d Cir. 2008); *Rich v. United States*, 811 F.3d 140, 145–46 (4th Cir. 2015); *Montez ex rel. Estate of Hearlson v. United States*, 359 F.3d 392, 399 (6th Cir. 2004); *Alfrey v. United States*, 276 F.3d 557, 564–66 (9th Cir. 2002); *Shivers v. United States*, 1 F.4th 924, 928–29 (11th Cir. 2021); *see also Ashford v. United States*, 511 F.3d 501, 505 n.14 (5th Cir. 2007) (collecting cases that show that "courts have held that the discretionary-function exception protects prison officials' decisions about inmate safety").

For example, in *Calderon v. United States*, 123 F.3d 947 (7th Cir. 1997), the Seventh Circuit confronted a claim under the FTCA by an inmate about security at a prison. The inmate

24

faulted the BOP for failing to protect him by placing him in the SHU. The Seventh Circuit ruled that the discretionary function exception applied because security decisions, including whether to discipline another inmate, involved a "discretionary act." *Id.* at 949. "It is clear that balancing the need to provide inmate security with the rights of the inmates to circulate and socialize within the prison involves considerations based upon public policy." *Id.* at 951.

Other courts in this District have granted summary judgment for the United States in cases where prison officials made decisions regarding prisoner location, transportation, or safety. *See, e.g.*, *Menolascina v. United States*, 2013 WL 707920, at *3 (N.D. Ill. 2013) (Tharp, J.) (holding that the discretionary function exception applies to transfer of prisoners); *Watson-El v. Wilson*, 2011 WL 2941289, at *4–5 (N.D. Ill. 2011) (Holderman, J.) (holding that the discretionary function exception applies to freezing prisoner funds when suspicious of extortion); *Barnes v. United States*, 2009 WL 3147001, at *2–7 (N.D. Ill. 2009) (Hibbler, J.) (holding that the discretionary function applies to housing decisions that result in inmate injury); *cf. Chess v. United States*, 836 F. Supp. 2d 742, 747–49 (N.D. Ill. 2011) (Bucklo, J.) (noting that the discretionary function exception applies to housing inmates but determining that summary judgment was not warranted when BOP regulations require specific treatment of mentally unwell prisoners); *Stacy v. United States*, 2021 WL 3849673, at *2 (N.D. Ill. Aug. 27, 2021) (Kennelly, J.) (noting that the discretionary function exception applies to where to house an inmate, but denying summary judgment on a claim about the failure to perform surgery). Key placement, while not directly about inmate location, transportation, or security, is in the same neighborhood. All involve the same goals – keeping inmates secure, and guards safe.

In the end, the placement of the cell key is left up to the discretion of the MCC because there is no mandatory policy. And placing the keys on another floor was a "permissible exercise

of policy judgment." *Reynolds*, 549 F.3d at 1112. The Seventh Circuit counts "considerations of public policy" to include "concerns with security, cost, overcrowding, medical care, and the suitability of each facility to meet the needs of the prisoner." *Lipsey v. United States*, 879 F.3d 249, 255 (7th Cir. 2018). The safekeeping of the cell key is another example. Maybe the key could or should have been placed elsewhere. But that decision was a policy judgment, and therefore falls within the statutory exception.

The protocol for the cell key is a discretionary policy judgment made by the BOP. It is "beyond reasonable dispute that its conduct was shielded by the exception." *See Keller*, 771 F.3d at 1023. So the United States is entitled to summary judgment on the claim about the placement of the keys.

## II.     Other Theories of Liability

To recap, the estate brought three FTCA claims, sounding in negligence, wrongful death, and survival. The estate put forward three theories of liability, too. The first theory was about the placement of the cell key.

The second and third theories have to do with whether the BOP responded to warning signs: some unstated (by Kogut), some shouted (by the inmates). Specifically, the estate argues that the BOP failed to conduct a proper screening during the intake process and thus failed to recognize that Kogut was a suicide risk. The estate also argues that the guard on duty in the SHU failed to take immediate action when other inmates shouted for help.

To prove a tort under the FTCA, a plaintiff must prove the elements "in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b). Claims of negligence, wrongful death, and survival have the same elements.

Under Illinois law, "[t]o state a cause of action for negligence, a complaint must allege facts that establish the existence of a duty of care owed by the defendant to the plaintiff, a breach of that duty, and an injury proximately caused by that breach." *Marshall v. Burger King Corp.*, 222 Ill.2d 422, 305 Ill. Dec. 897, 856 N.E.2d 1048, 1053 (2006). A wrongful death claim has the same elements, too. *See Bovan v. Am. Fam. Life Ins. Co.*, 386 Ill. App. 3d 933, 325 Ill. Dec. 40, 897 N.E.2d 288, 292 (2008) ("To state a cause of action under the Wrongful Death Act, the plaintiff must show that: (1) defendant owed a duty to the deceased; (2) defendant breached that duty; (3) the breach of duty was the proximate cause of the deceased's death; and (4) monetary damages resulted to persons designated under the Act.") (citation omitted). And a claim for survival simply "preserves the right of action for a personal injury that accrued before the death of the injured person . . . ." *Cretton v. Protestant Mem. Med. Ctr., Inc.*, 371 Ill. App. 3d 841, 309 Ill. Dec. 422, 864 N.E.2d 288, 298 (2007). So all three torts require a showing of duty, breach, proximate causation, and damages.

The government moves for summary judgment on the element of causation. Proximate causation has "two distinct requirements: cause in fact and legal cause, which is a policy decision that limits how far a defendant's legal responsibility should be extended for conduct that, in fact, caused the harm." *Lee v. Chicago Transit Auth.*, 152 Ill.2d 432, 178 Ill. Dec. 699, 605 N.E.2d 493, 503 (1992).

"Cause in fact can only be established when there is a reasonable certainty that a defendant's acts caused the injury or damage." *Id.* Specifically, the Court must consider whether "the conduct was a material element and a substantial factor in bringing about the injury." *Id.* If the tortfeasor's actions are a but-for cause, then the question moves to legal cause. "Legal cause 'is essentially a question of foreseeability: a negligent act is a proximate cause of

an injury if the injury is of a type which a reasonable man would see as a likely result of his conduct.'" *Id.* at 709 (citation omitted).

But a court should be wary of granting summary judgment on a failure to show causation: "Whether or not the defendant's conduct proximately caused the plaintiff's injury ordinarily is a question for the finder of fact to decide; only rarely are the facts so clear that the court can resolve the issue as a matter of law." *Palay*, 349 F.3d at 432.

The Court concludes that the estate has not come forward with enough evidence to support a finding of proximate causation about the intake interviews. But the estate has come forward with enough – just enough – to support a potential claim about the cries for help from other inmates.

## A. The Intake Interview

The first theory is that the BOP failed to recognize that Kogut was suicidal. The estate claims that the correctional staff negligently failed to recognize that "Kogut was at high risk for suicide," and failed "to take simple precautions to prevent his tragic death." *See* Kogut Mem., at 2 (Dckt. No. 87).

That theory doesn't get very far before hitting a sizeable roadblock. Kogut did not express any feelings that he was thinking about harming himself. And none of the interviewers thought that he posed a risk of self-harm.

Two BOP employees interviewed Kogut during the intake process. Correctional Counselor Michael Wright conducted an intake screening. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 5 (Dckt. No. 86). He gave Kogut the one-page psychology services questionnaire about his mental health history. *See* Inmate Questionnaire (Dckt. No. 75-7). Wright then interviewed Kogut and went over his answers, in person.

28

After meeting with Wright, Kogut met with Lida Carrera, a member of the MCC's medical staff. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 13 (Dckt. No. 86). She asked him questions and assessed the risk of suicide. *Id.* at ¶ 15.

Wright and Carrera had the same overall reaction. Both of them thought that he appeared normal. Neither one of them thought that he posed a risk of suicide. *See* Wright Dec., at ¶ 11 (Dckt. No. 75-3) (stating that he "did not find anything in his demeanor or emotional state that made [him] believe that he might harm himself"); Carrera Dec., at ¶ 7 (Dckt. No. 75-4) (stating that Kogut's behavior gave her "no cause for concern" about a "risk of self-harm").

The estate does not point to any written or oral statement by Kogut that he was considering harming himself. The estate relies heavily on Kogut's answer to one question on the questionnaire.[6] Kogut stated that he was "tense, nervous, anxious." *See* Def.'s Resp. to Pl.'s Statement of Facts, at ¶ 5 (Dckt. No. 91); *see also* Inmate Questionnaire, at 1 (Dckt. No. 75-7).

But it is too big of a jump to leap from an expression of nervous energy to an intention to harm one's self. An expression of nervous energy is one thing. An intention to harm one's self is another. Kogut was a newly arrested police officer, and he suddenly found himself on the other side of the criminal justice system. It is not surprising that he was feeling tense, nervous, and anxious. Who wouldn't? Reading that answer as a hint of possible suicide is a bridge too far.

The estate's reading is inconsistent with the rest of Kogut's form, too. Kogut denied having any issues with mental health. And he repeatedly denied having suicidal thoughts or suicidal tendencies. When asked whether he had ever "seriously considering harming or killing

---

[6] Kogut did not answer a few of the questions on the questionnaire. Those non-answers give this Court some pause. But the estate does not point to Kogut's failure to answer those questions as a reason to think that he posed a risk to himself. So, the argument is waived.

yourself," and when asked whether he had ever "attempted to harm or kill yourself," Kogut answered "No" (twice). *See* Inmate Questionnaire, at 1 (Dckt. No. 75-7).

The form asked if he was "thinking of harming or killing [him]self now." *Id.* And it gave an offer of help, in all caps. "IF YES, IT IS IMPORTANT TO LET US KNOW SO WE CAN PROVIDE YOU WITH COUNSELING AND SUPPORT." *Id.* He answered "NO." *Id.*

The estate wants to read the more general statement (about feeling "tense, nervous, anxious") to override the more specific statements about having no history or inclination to harm himself. But the specific triumphs over the general. Kogut told the BOP that he was not thinking of harming himself, and did so in person and on paper. So the BOP did not have reason to think that he was at risk of harming himself, based on Kogut's expression of nervousness and anxiety.

The estate also points to the fact that Kogut identified himself as a police officer. The parties debate whether Kogut was giving a *reason* for isolation, or making a *request* for isolation. But suppose the estate's reading is right, and Kogut was asking for isolation. In that case, the BOP would have referred Kogut to a supervisor and psychology services. *See* Special Post Orders, at 9 (Dckt. No. 75-6).

Even so, it is entirely speculative to think that such a referral would have made a difference. Kogut spoke with two professionals at the MCC, and both of them thought that he seemed normal. Neither one of them thought that he was suicidal, or posed a risk of self-harm. It requires too much speculation to think that an interview with a third person would have yielded a different outcome.

Kogut did not given any indication – orally, or in writing – that he was considering self-harm. It is pure speculation to suggest that Kogut would have given different answers in a third

interview. And it is pure conjecture to think that third interviewer would have come to a different conclusion about whether Kogut posed a risk to himself.

The claim rests on nothing more than speculation and conjecture, which means that the estate has no claim. *See Campbell v. United States*, 904 F.2d 1188, 1194 (7th Cir. 1990) ("Proximate cause is not established . . . where the causal connection is 'contingent, speculative, or merely possible.'") (quoting *Newell v Corres*, 125 Ill App. 3d 1087, 91 Ill. Dec. 283, 466 N.Ed.2d 1085, 1088 (1984)); *Jutzi-Johnson v. United States*, 263 F.3d 753, 756–57 (7th Cir. 2001) ("It is sheer conjecture that an interview with the jail psychologist would have produced sufficient information to have enabled the psychologist to infer that [the plaintiff] was a suicide risk and place him on suicide watch.").

As the non-movant, Kogut is entitled to "reasonable inferences from the evidence, but not speculative inferences in his favor." *See White v. City of Chicago*, 829 F.3d 837, 841 (7th Cir. 2016). And here, it is entirely speculative to think that BOP's screening caused Kogut to harm himself. There is no reason to think that more screening would have saved his life. The government's motion for summary judgment is granted to the extent that the estate's claims involve the MCC's screening procedures.

**B.     The Shouting**

The estate's other theory is that the guard failed to respond to shouts for help from other inmates. The estate claims that "the correctional officer on duty was negligent in responding to detainees in nearby cells who were screaming for the officer when they heard Mr. Kogut thrashing about in his cell as he asphyxiated." *See* Kogut Mem., at 2 (Dckt. No. 87).

The estate relies on testimony from two other inmates about the noise in the SHU that night. According to them, other inmates cried for help, trying to get the guard's attention that something was wrong. But Cannon – the only guard on patrol in the SHU that night – did nothing until he saw Kogut with his own eyes, hanging by a bedsheet.

The estate offers testimony from two inmates. Frank Farella had the cell next to Kogut. He testified that he woke up around 2:30 a.m. to the sound of "commotion." *See* Farella Dep., at 20:9-17 (Dckt. No. 75-11). "I heard inmates hollering." *Id.* at 20:14. Two or three inmates were yelling, and they were "very loud." *Id.* at 20:21 – 21:4. They were yelling for the officer, saying that "the guy in his cell needed attention, medical attention." *Id.* at 21:6-17. According to him, the yelling lasted 10-15 minutes, until the guard arrived at Kogut's cell. *Id.* at 22:1-15; *see also id.* at 50:1-14.

Robert Vaughan – the other officer arrested with Kogut – testified about the noise, too. He heard a banging noise. *See* Vaughan Dep., at 38:4-8 (Dckt. No. 75-10). "In the cell there is a sink attached to a toilet and there was like somebody was kicking it, banging against it, the metal." *Id.* at 38:4-6. "It sounded like a fight to be honest with you. It sounded like I thought the officers were in there trying to get control of somebody, and it sounded like – it sounded like a fight. Like flopping around and banging against the toilet area." *Id.* at 40:20-25; *see also id.* at 41:9 – 42:20.

And then came the yelling. "It was hard for me to sleep, and then all of a sudden there was a loud banging noise that sounded like there was a fight in a cell a couple doors down from me, and then everybody in the SHU was screaming." *Id.* at 35:10-15. They weren't just screaming. "They were screaming bloody murder and that went on for it seemed like 20

minutes, maybe a half hour. I mean, it seemed like a long time that it went on. And then all of a sudden it was just quiet again." *Id*. at 35:15-19; *see also id.* at 44:11-23.

All told, according to Vaughan, the banging and screaming lasted about 20 minutes. *Id.*; *see also id.* at 45:3 – 46:8, 54:8 – 55:15. That's a lot of noise, for a long time.

But the noise matters only if the guard heard it. Presumably an officer can't be liable for failing to respond to the shouting unless he heard the shouting. (That principle might not apply if the theory is that the officer *should have* heard the shouting, but didn't – say, by leaving his or her post, or playing music too loudly. But that theory doesn't appear to apply here.) The theory appears to be that Cannon heard the shouting, but ignored it.

But did Cannon hear it? The estate offered evidence about *shouting*, not evidence of *hearing*. Is evidence of *making* sound evidence of *hearing* sound? If a tree falls in the forest, is that evidence that a lumberjack heard it fall?

There is no direct evidence that Cannon heard the shouting. For example, he didn't admit that he heard the shouting in the days after the incident. There is no deposition testimony from Cannon admitting that he heard commotion, either. In fact, there is no deposition testimony from him at all.[7]

But the record does include a declaration from Cannon. *See* Cannon Dec. (Dckt. No. 75-2). He stated that all was quiet. "During my 1:46 a.m. rounds the inmate ranges were quiet and remained so. I returned to the SHU office and I did not hear any noise or commotion on the ranges." *Id.* at ¶ 7. He didn't hear anything during the next round, either, meaning the round when he made the discovery. "I next made rounds at approximately 2:15 a.m. As was my usual

_____

[7] The record does not include any deposition transcript for Cannon, for reasons that are unclear to the Court. So the Court does not know if he was deposed. In a status report during discovery, the parties stated that they planned to take his deposition. *See* Joint Status Report (Dckt. No. 63).

practice, I went from cell to cell, checking on the inmates. The inmate range was quiet and dark, and the several inmates that I checked prior to reaching Kogut's cell appeared to be sleeping." *Id.* at ¶ 8.

That testimony is consistent with the video footage. The camera captured Cannon on his patrol, going from cell to cell. *See* Video, at 0:15 – 0:32 (Dckt. No. 75-5). Cannon did not appear to notice any sounds. He did not look around, and did not give any indication that the inmates were screaming. *Id.*

There is evidence of *screaming*, but there is no direct evidence of *hearing*. So the question is whether there is circumstantial evidence that the guard heard the screaming. That is, the question is whether there is enough in the record to support a finding by a reasonable factfinder that Cannon did, in fact, hear the cries for help.

An ability to hear depends on a number of factors. Volume, proximity, acoustics, and hearing ability come into play. So does the existence of competing noise (*e.g.*, a noisy radiator, or HVAC system, or radio, and so on). There is evidence in the record that the screaming was very loud. And the Court will assume, for the sake of argument, that Cannon had the hearing ability of an average person. There's nothing in the record suggesting a hearing impairment.

The problem is that the record doesn't include much else to go on. It's not clear who was yelling, or where they were located. It is unknown how far away they were from Cannon. It is not even clear where, exactly, Cannon was during the 15-20 minutes before the discovery of Kogut. Cannon's declaration says that he was in his office after the round at 1:46 a.m., before he started the round at 2:15 a.m. (when he discovered Kogut). *See* Cannon Dec., at ¶ 7 (Dckt. No. 75-2). But it is unclear when he got there, or how long he stayed in that office before he started the next patrol.

34

Was he in the office the entire time, between rounds? For how long, and when? Was there other noise? Was he moving? Listening to music? Typing on his keyboard? Maybe he was on the other side of the floor, in the officer's office. Or maybe not. Maybe it was quiet in that office, and maybe the walls were relatively soundproof. Or maybe not.

The record also doesn't reveal much about the acoustics in the SHU. The Court assumes that the floor included heavy walls and thick doors. It was a prison, after all. But the Court doesn't know. There is nothing in the record about how sound traveled on that floor. There is nothing in the record about whether a guard, sitting in the office, could hear yelling from across the floor, meaning yelling by inmates near Kogut's cell.

But the record does include a little. Vaughan testified that he heard the yelling. And he was four cells down (plus the shower area) from Kogut. So, sound must have traveled that far. And Vaughan's cell wasn't far from the office for the guards. *See* Map (Dckt. No. 91-1).

Overall, the Court concludes that the estate has provided enough evidence to survive summary judgment, but just barely. The record is thin about whether Cannon heard the screaming. But there is evidence of screaming, by several inmates. And one of the inmates wasn't far from the office for the guards. That's enough to get to trial. The motion for summary judgment on the claim about responding to the noise is denied.

*     *     *

One final word. Stanley Kogut's death was a terrible tragedy. It was an unspeakable loss and a heart-breaking end to the life of a public servant. The Court fully acknowledges how difficult the situation must be for all members of his family. And the Court understands the pain that they undoubtedly continue to suffer.

**Conclusion**

For reasons stated above, the motion for summary judgment filed by the United States is granted in part. The Court grants the motion for summary judgment on the FTCA claim about the location of the keys, and about evaluating the risk of suicide during the screening interviews. The Court denies the motion for summary judgment on the FTCA claim about responding to the calls for help.

Date:   November 22, 2021          _____

                                   Steven C. Seeger
                                   United States District Judge